704 A.2d 1246

**Stephen P. GINSBERG et al.**

v.

**Virginia A. McINTIRE et al.**

**No. 52, Sept. Term, 1997.**

Court of Appeals of Maryland.

Jan. 23, 1998.

Modifying Decision on Grant of
Reconsideration Feb. 6, 1998.

528

---

Carter G. Phillips (Mark D. Schneider, Michael J. Hunseder, Sidley & Austin, on brief), Washington, DC, for appellants.

Dale A. Cooter (Cooter, Mangold & Tompert, P.L.L.C., James E. Tompert, all on brief), Washington, DC, for appellees.

Before BELL, C.J., ELDRIDGE, RODOWSKY, CHASANOW, RAKER and WILNER, JJ., and ROBERT L. KARWACKI, J. (retired, Specially Assigned).

RODOWSKY, Judge.

We granted certiorari on our own motion in this appeal, prior to its consideration by the Court of Special Appeals, primarily to consider the following, somewhat argumentatively phrased, issue:

"Did the trial court commit reversible error by permitting appellee to call a sitting Maryland state court judge as a witness on an irrelevant issue and to trumpet continually his judicial status before the jury, thereby allowing appellee to stamp her case with the imprimatur of a sitting judge?"

The appeal also raises sufficiency of the evidence issues, embellished by the parties' disagreement over who are parties appellant and what damages are included in the final judgment.

Kensington Professional Center, Inc. (KPC) developed a relatively small (13,127 s.f.), three-story office building at 10901 Connecticut Avenue in Montgomery County. Formed in November 1984 under Maryland law by Stephen P. Ginsberg, an ophthalmologist and one of the appellants, and by John N. McIntire, the owner of a chain of hardware stores, a builder, and a non-practicing lawyer, KPC was their vehicle for the construction, leasing, and operation of the then contemplated office building. Dr. Ginsberg owned fifty percent of the KPC stock and John McIntire placed his fifty percent of KPC stock in his living trust. Dr. Ginsberg's objective in the venture seems to have been to secure a suitable and stable location for his practice, while John McIntire's objective seems to have been investment. John McIntire died before the building was completed. On his death his widow, Virginia A. McIntire, one of the appellees, became beneficial owner of his KPC stock. When the building was completed Dr. Ginsberg occupied the second floor and managed the building for KPC. In the litigation now before us Virginia McIntire alleges, *inter alia,* that Dr. Ginsberg violated his duty of loyalty to KPC in a number of ways, including particularly by unilaterally reducing the second floor rent that had been agreed upon with John McIntire.

Inasmuch as the verdicts of the fact finders were in favor of the appellees, plaintiffs below, we shall present the facts most favorable to the plaintiffs. Before doing so, however, we point out that there are at least three different leases that appear in the evidence for Dr. Ginsberg's medical offices on the second floor of the KPC building. Each of these leases is to Stephen P. Ginsberg, M.D., P.A., Dr. Ginsberg's professional association (the P.A.). Each lease and any addendum are signed for KPC by Dr. Ginsberg, each lease and any addendum are signed for the P.A. by Dr. Ginsberg, and Dr. Ginsberg admits that he prepared each of the leases. Specifically the leases are:

a lease dated February 21, 1987, at an annual rent of $108,200 or $20 per square foot, for an initial term of five years with four additional five-year extensions at the option of the P.A. (PX 21);

a lease dated September 1, 1987, at an annual rent of $86,560 or $16 per square foot, for an initial term of five years with four additional five-year extensions at the option of the P.A., and containing an addendum exercising the first renewal option as of September 1, 1987 (PX 18); and

a lease dated September 1, 1987, at an annual rent of $86,560 or $16 per square foot, for an initial term of ten years together with four additional five-year extensions at the option of the P.A. (PX 19).

Each lease dated September 1, 1987, bears a legend typed at the top of the first page and reading, "This lease takes precedence over the earlier lease between same parties dated February 21st, 1987."

At KPC's organizational meeting Dr. Ginsberg was elected president and a director, John McIntire vice president and a director, Dr. Ginsberg's wife, Ruth Ginsberg, one of the appellants, secretary and treasurer, and John McIntire's long-time accountant, Glenn M. Hendrickson (Hendrickson), assistant secretary-treasurer. John McIntire's stock in KPC was issued to his living trust in consideration of his having contributed the land to the venture, valued at $36,000, and in

consideration of services rendered and to be rendered in managing the project. Dr. Ginsberg executed a demand note to the order of KPC in the amount of $125,000 in consideration of his stock. KPC also obtained a construction loan from Citizens Savings Bank, F.S.B. (Citizens) for $1,344,000 that closed October 3, 1986, and was repayable in five years from that date. The McIntires and the Ginsbergs personally guaranteed that loan.

By November 1986 John McIntire had been stricken with cancer that was so painful that his wife administered shots to him approximately every two and one-half hours. Nevertheless, McIntire was able, through a real estate broker, to acquire Merrill Lynch Realty/Chris Coile, Inc. (Merrill Lynch) as the tenant for the first floor of the building. The lease to Merrill Lynch, dated February 4, 1987, was for a term of ten years commencing on October 1, 1987, at an annual rent of $120,494.04 or $22 per square foot.

John McIntire died in Florida on February 25, 1987, of a heart attack following an automobile accident. He and Virginia McIntire had left for Florida on Sunday, February 22, 1987. On the day before their departure, Saturday, February 21, 1987, there was a luncheon at the McIntire home attended by their children and grandchildren who anticipated that John McIntire would not return alive from Florida because of his cancer. After John McIntire's death Dr. Ginsberg assumed the business direction of KPC.

Costs of the project exceeded the construction loan, and it was necessary for KPC to borrow an additional $200,000 from Citizens that was secured by a second mortgage dated July 31, 1987. Dr. Ginsberg, Mrs. Ginsberg, and Virginia McIntire personally guaranteed the second mortgage. The discussions between Dr. Ginsberg and Virginia McIntire concerning cost overruns and the additional mortgage financing were the first discussions that she had with Dr. Ginsberg concerning the KPC project after John McIntire's death.

In the late summer of 1987, Dr. and Mrs. Ginsberg came to Virginia McIntire's home and explained that additional funds

were needed to meet the cost of the building. Mrs. McIntire advanced $120,000.

Merrill Lynch moved into the first floor space in August or September of 1987, and the P.A. occupied the second floor beginning in October of that year. The P.A. paid rent at the rate of $16/s.f. The amount that Dr. Ginsberg and John McIntire had agreed upon as KPC's contribution to improving leased space for particular tenants, called "tenant improvements" or "build-outs," was $8/s.f. (the tenant standard). The cost of Merrill Lynch's build-outs were at the tenant standard. Dr. Ginsberg's medical offices, however, were much more expensive. The build-out for the P.A. totaled approximately $145,000 or $26.62/s.f. No part of the third floor was rented until March 1989. That floor consisted of 2240 s.f., 800 s.f. of which were leased in 1989 to a physical therapist for $18/s.f., with four months free rent in lieu of tenant improvements.

The rents generated from the two or three tenants were insufficient to meet the expenses of the building so that the stockholders of KPC regularly advanced monies to offset the negative cash flow. It appears that the building broke even in 1993 and had a slightly positive cash flow in 1994. To the time of trial in February 1996, Mrs. McIntire had loaned roughly $300,000 to the venture, and the Ginsbergs had loaned about $370,000.

The repeated calls for stockholder loans to KPC prompted Mrs. McIntire to ask her son-in-law, Richard Michael Powell (Powell), to advise her concerning KPC. Powell had business experience, principally in government-assisted, equity syndication of central city real estate ventures. Following a meeting with Dr. Ginsberg in August of 1988, Dr. Ginsberg sent Powell copies of the respective leases for the first and second floors. The document transmitted as the lease for the second floor was PX 19, a lease with an initial term of ten years at a rental of $16/s.f.

The notation on the top of the first page of PX 19 prompted Powell to inquire of Dr. Ginsberg about the February 21, 1987 lease referred to therein. Dr. Ginsberg told Powell that the

February 21, 1987 lease had been lost but that its terms were the same as the lease dated September 1, 1987, and that the latter lease had been constructed to replace the lost lease of February 21.

Powell explored refinancing the KPC building to reduce expenses, but his efforts were unsuccessful because the cash flow was insufficient. Powell concluded that relief for Mrs. McIntire could not be obtained through refinancing in view of the deal that had been struck between John McIntire and Dr. Ginsberg as evidenced by the lease dated September 1, 1987 (PX 19).

The first and second trust loans to Citizens were due December 1, 1992. The loans would have to be refinanced, but Mrs. McIntire took the position that she would not execute any guarantees. By September 1992 both Dr. Ginsberg and Mrs. McIntire had engaged counsel. A meeting was held in October 1992 attended by the Ginsbergs, Powell, who then held a power of attorney to act for Mrs. McIntire, and their respective counsel. In the course of the meeting counsel for Mrs. McIntire asked Dr. Ginsberg if he had a copy of the February 21 lease, and Dr. Ginsberg replied that he did not. Counsel asked why the September 1 lease had been constructed, and Dr. Ginsberg replied that the February lease had been lost. Counsel asked if the terms and conditions of the September lease were identical to those of the February lease, and Dr. Ginsberg replied that they were one and the same.

In the fall of 1992 Dr. Ginsberg had again sent to Powell, at his request, operating statements for KPC and copies of the leases, including the new lease for part of the third floor. The lease for the second floor furnished on this occasion, PX 18, differed from the copy previously received by Powell, PX 19, in that PX 18 was for an initial term of five years and contained an addendum exercising the first five-year renewal option.

By December 9, 1992, Citizens agreed with the Ginsbergs to

extend its loans for three years, on personal guarantees.[1] Mrs. McIntire, however, would not agree, and Citizens proceeded with foreclosure. Ultimately, at the foreclosure sale on May 11, 1993, Mrs. McIntire agreed to the loan extension and signed the guarantee, but only after a prospective buyer whom she knew decided not to bid on the property.

In September 1993, Powell received from a Florida attorney who was representing the estate of John McIntire copies of financial statements and correspondence that had been transmitted to that attorney by Hendrickson in September 1987. Included in the material was a letter of July 20, 1987, to Citizens from the appraiser who had valued the KPC property for the first trust construction loan. That appraisal contained synopses of the Merrill Lynch and P.A. leases and reported the latter to be at $20/s.f. Powell had previously asked Hendrickson for a copy of the February 21 lease but Hendrickson said he did not have it and that Dr. Ginsberg "had everything." Powell then engaged counsel, Durke Thompson, Esq. (Thompson), to determine if the February 21 lease could be located.

Thompson, utilizing Maryland Rule 2–404, "Perpetuation of Evidence," deposed Citizens for the purpose of requiring it to produce its records concerning the loans to KPC. That deposition took place on February 9, 1994. Among the documents produced at that deposition was a copy of the February 21, 1987, $20/s.f. lease to the P.A. Also produced at the deposition was a copy of a September 1, 1987 lease to the P.A. at $16/s.f., PX 26, which is identical to PX 18, a lease that the representatives of Mrs. McIntire had previously obtained from Dr. Ginsberg.

The instant action was filed July 7, 1994, and was tried on a second amended complaint. The plaintiffs are Mrs. McIntire and The John N. McIntire Trust (the Trust) by and through its trustees, Mrs. McIntire and her daughter, Susan Law-

---

1. The work up for the Board of Directors of Citizens recommending the extension of the KPC loans utilized $16/s.f. as the rent paid by the P.A.

rence. At least two of the counts of the three-count complaint asserted derivative claims on behalf of KPC which is joined as a nominal defendant. Count I alleged breaches by Dr. and Mrs. Ginsberg of their duties of loyalty to KPC. Count II claims on behalf of KPC against the P.A. for non-payment of rent, with late charges and interest, based on the February 21, 1987 lease. Count III of the second amended complaint sounded in deceit and can be read as a claim by Mrs. McIntire in her own right against Dr. Ginsberg only. The plaintiffs demanded a jury trial which the defendants successfully opposed as to Count II, the rent claim, because the preprinted provisions in the form utilized for all of the leases to KPC contained a waiver of jury trial. Counts I and III, however, were tried to a jury.[2] Dr. Ginsberg and Mrs. Ginsberg had separate counsel.

By the time this action came to trial in February and March of 1996, the claims asserted under Count I included, in addition to unpaid rent, claims based on the unpaid stock acquisition note, unpaid tenant improvements, unpaid passthroughs to the tenants of landlord's expenses, and the payment by KPC of allegedly excess interest costs on refinanced loans.

The claims for compensatory damages against Dr. and Mrs. Ginsberg on Count I were submitted to the jury on special interrogatories, and the jury found against each defendant, awarding compensatory damages to KPC totaling $1,049,-852.87. Prior to submission of the case to the jury, Count III, the fraud count, was the subject of extended discussion between court and counsel. With the consent of the plaintiffs, Count III was submitted to the jury as a claim on behalf of KPC. It was submitted against Mrs. Ginsberg as well as against Dr. Ginsberg. The jury found in favor of KPC against Dr. Ginsberg on Count III and awarded the identical damages that had been awarded under Count I. On Count III the jury found in favor of Mrs. Ginsberg. The docket entry of March

---

2. No issue has been raised before us as to the propriety, under Maryland practice, of trying to a jury a stockholder's derivative claim on behalf of a corporation against its director and/or officer.

5, 1996, reads, "Verdict: As to breach of fiduciary duty and fraud in favor of the plaintiff," followed by an entry reading simply, "Verdict sheet, filed." The clerk's file contains the four verdict sheets described above which itemize, but do not total, the damages and which identify the defendant against whom the damages are assessed.

The jury trial resumed the next day to consider punitive damages. The docket entry of March 6, 1996, reads, "Verdict on punitive damages in favor of the plaintiff against the defendant Stephen Ginsberg," followed by the entry, "Verdict sheet, filed." The verdict sheet asked, "Is there an award for punitive damages against Stephen Ginsberg?" to which the jury replied, "Yes," awarding $360,000.

On March 8, 1996, the court, sitting non-jury, considered Count II and awarded KPC $196,853.25 in damages, $36,980 in attorney's fees, and $2,979.27 in expenses against the P.A.

On March 13, 1996, the clerk noted on the docket the entry in the judgment index of the $360,000 punitive damages judgment as one "in favor of the plaintiff Virginia A. McIntire against the defendant Stephen P. Ginsberg." That same day the clerk noted on the docket the entry in the judgment index of the judgment on Count II in favor of KPC against the P.A. in the amounts set forth above.

Dr. Ginsberg, Mrs. Ginsberg, and the P.A. filed post-trial motions on March 18, 1996. Present appellate counsel for the appellees entered his appearance on May 30, 1996. A hearing was held on the motions on June 11, 1996. The motions were denied, and the docket so noted that day.

On August 8, 1996, the clerk docketed an order denying the defendants' post-trial motions and made an entry, "Judgment Entered." On August 19, 1996, the clerk made a docket entry that judgment was entered in favor of KPC against Dr. Ginsberg in the amount of $1,049,852.87, and made a separate docket entry that judgment in the same amount had been entered in favor of KPC against Mrs. Ginsberg. In order to clarify that the judgments against Dr. and Mrs. Ginsberg were joint and several, appellants moved on August 19, 1996, fur-

ther to amend the judgment, and, by order signed and docketed August 29, 1996, judgment was entered in favor of KPC against Dr. and Mrs. Ginsberg, jointly and severally, in the amount of $1,049,852.87.

The order for appeal was filed September 6, 1996. In relevant part the notice of appeal reads as follows:

"Dr. Stephen Ginsberg and Ruth Ginsberg, Defendants, hereby notice an appeal from the final judgment entered in this case on August 29, 1996 (by Order vacating the judgment of August 8, 1996 and entering a revised judgment), and from all adverse interlocutory orders and partial judgments."

# I

We begin by addressing appellate procedural issues. Appellants contend that the entire final judgment is that entered on August 29, 1996, and that it does not include either the punitive damages awarded against Dr. Ginsberg or the breach of contract damages awarded against the P.A. Appellees point out that on March 13, 1996, the jury's $360,000 punitive damage verdict and the court's awards totaling $236,812.52 were entered on the docket as judgments and indexed.

The issue is governed by Maryland Rule 2–601, prior to its amendment effective October 1, 1997, and by Maryland Rule 2–602. The entry of judgment requires an entry on the file jacket or on the docket. Maryland Rule 2–601(b). Under Rule 2–602(a),

"an order or other form of decision ... that adjudicates fewer than all of the claims in an action ... or that adjudicates less than an entire claim, or that adjudicates the rights and liabilities of fewer than all the parties to the action:

"(1) is not a final judgment;

"(2) does not terminate the action as to any of the claims or any of the parties; and

"(3) is subject to revision at any time before the entry of a judgment that adjudicates all of the claims by and against all of the parties."

Under Rule 2–602(a) judgment in this *action* became final on August 29, 1996, when the final adjudications on the *claims* asserted in Counts I and III were entered, but the document signed by the court and entered on the docket on August 29 did not embrace all of the adjudications that became final judgments on that date. Following the return of the jury verdicts on the claims in Count I and on the compensatory damages part of the claims in Count III, the clerk did not effectively enter judgment on the verdict. The docket entry of March 5, 1996, did not identify the party or parties against whom the verdicts were rendered, and the mere docket notation that the verdict sheet was filed in the court file did not docket the amount of the judgment or identify the parties. The intent of Rule 2–601 at the time of the subject proceedings was for the judgment to be discernable from the docket, without the necessity of examining papers in the court file. *See Estep v. Georgetown Leather Design,* 320 Md. 277, 577 A.2d 78 (1990). Judgment, however, was effectively entered on Count II by the docketing of the court's order of March 8, 1996, and judgment on that part of the claim in Count III seeking punitive damages was effectively entered on March 13, 1996, by the docketing as a judgment of that verdict. But because the adjudication of all of the claims as to all of the parties had not been docketed, all of the adjudications remained interlocutory until August 29, 1996. *See Quartertime Video & Vending Corp. v. Hanna,* 321 Md. 59, 580 A.2d 1073 (1990) (per curiam); *Planning Bd. v. Mortimer,* 310 Md. 639, 530 A.2d 1237 (1987).

A peculiarity in the instant matter has to do with the parties in whose favor judgment is entered on Count III. The August 29, 1996 order in effect merges the amounts of the judgments for compensatory damages against Dr. Ginsberg on Count III and on Count I into a single judgment. That judgment, consistent with the verdict sheet, is in favor of KPC

and treats the claim for compensatory damages on Count III as a derivative claim. The judgment for punitive damages on Count III, however, is docketed as a judgment in favor of Mrs. McIntire. No appellant has raised any issue in this Court concerning that discrepancy. Consequently, our only concern is whether the discrepancy prevents the adjudications of the claims in Count III from constituting a final judgment. We hold that the judgment on Count III is final, and that it became appealable when judgment in the action became final and appealable on August 29, 1996. An adjudication which clearly determines an entire claim as to all parties is a final judgment, even if it is or might be in error.

The appellees contend that the P.A. is not a party to this appeal because of the way in which the order for appeal was phrased. The consequence, appellees say, is that the judgment on Count II is final but not appealed so that it operates as issue preclusion against the only appellants, Dr. and Mrs. Ginsberg, as to the determination that the lease calling for $20/s.f. rent was the lease agreed upon between Dr. Ginsberg and Mr. McIntire.

We need not decide whether the P.A. is a party to this appeal and whether Dr. and Mrs. Ginsberg are precluded from contesting the jury's finding, implicit in the judgment on Count I against Dr. Ginsberg, that the operative lease was that at $20/s.f. This is because we hold in Part II of this opinion that there was sufficient evidence to support the verdict on Count I against Dr. Ginsberg and our reversal of the judgment on Count I against Mrs. Ginsberg, discussed in Part III of this opinion, recognizes the $20/s.f. lease as the operative lease.

## II

Dr. Ginsberg contends before us that his motion for judgment at the conclusion of all of the evidence should have been granted. His brief focuses only on two claims, the one based on the payment of $16/s.f. as opposed to $20/s.f. in rent to KPC, and a claim that a reduction from $125,000 to $50,000

of his note to KPC for stock was unauthorized. Dr. Ginsberg testified that he agreed with John McIntire that the market value rental of the second floor was $16/s.f. According to Dr. Ginsberg, the lease reciting a rent of $20/s.f. was prepared and signed at the request of John McIntire for his use in obtaining the second trust additional financing from Citizens. Similarly, Dr. Ginsberg testified that his stock purchase obligation was reduced by agreement with John McIntire when the latter realized that, because of his cancer, he would be unable to render the anticipated amount of services to KPC so that the $75,000 reduction would equalize the contributions between the corporation's two founders. Dr. Ginsberg's position concerning these two claims was substantially supported by the testimony of Hendrickson who was called as a witness for the defense. Because Hendrickson and Dr. Ginsberg were the only two living people who had personal knowledge of the agreements between Dr. Ginsberg and John McIntire, Dr. Ginsberg submits that his motion for judgment should have been granted.

The argument fails both procedurally and substantively. Procedurally, Dr. Ginsberg's motions for judgment at the end of all of the evidence and at the conclusion of the plaintiffs' case did not challenge the sufficiency of the evidence. At the end of the entire case Dr. Ginsberg sought judgment as a matter of law by arguing that limitations had run on all of the claims, and he sought to have Count III dismissed as duplicative of Count I. In arguing that motion for judgment, counsel for Dr. Ginsberg renewed arguments that he had made at the end of the plaintiffs' case in support of his motion for judgment, but the arguments made earlier had not attacked the general sufficiency of the evidence.

In any event Dr. Ginsberg's argument rests on credibility and not on the lack of sufficient evidence. He argues that no reasonable juror could fail to believe Dr. Ginsberg's position because it was fully corroborated by Hendrickson. The short answer, of course, is that the jury need not have believed either Dr. Ginsberg or Hendrickson. Further, the claims on which Dr. Ginsberg focuses are supported by sufficient evi-

dence. John McIntire is said by Dr. Ginsberg to have agreed to the $16/s.f. rental and to a $50,000 payment for stock, but there is no writing signed by John McIntire that corroborates the alleged agreements. Another major credibility issue in the case involved when the leases were signed. Dr. Ginsberg testified that the February 21 and September 1 leases were signed by him in Mr. McIntire's presence at a meeting between only those two persons in McIntire's office, beginning at 10:00 a.m. on Saturday, February 21, 1987. Members of the McIntire family testified that Mr. McIntire was at home that morning and too ill to leave home by himself.

Although Dr. Ginsberg argues that the claims against him rest on speculation and not evidence, if the jury found that Dr. Ginsberg had misrepresented that the February 21 lease was lost and had misrepresented that it was identical to the September 1 lease, then the jury properly could infer that the February 21 lease was the true lease. Further, if the jury disbelieved Dr. Ginsberg and Hendrickson concerning the reduction in the stock purchase obligation, the stock purchase claim is supported by Dr. Ginsberg's note to KPC for $125,-000.

### III

Mrs. Ginsberg contends that her motion for judgment should have been granted. We agree.

■ Mrs. Ginsberg did not testify at the liability, compensatory damages phase of this trial. Her activities, vis-a-vis KPC, are described principally by Mrs. McIntire and by Hendrickson. The testimony by Mrs. McIntire concerning Mrs. Ginsberg did not involve any claim on which the jury found against Mrs. Ginsberg. Mrs. McIntire described Mrs. Ginsberg's accompanying her husband when he sought loans from Mrs. McIntire to KPC. No claim, however, was based on advances made during the construction period or on the advances made monthly during the years when KPC had a negative cash flow. Hendrickson testified that when the building was completed Mrs. Ginsberg took over paying the

bills and running the checkbook. She deposited the rent checks but had no role in determining rent. She had no role in preparing financial statements, which Hendrickson continued to do. Mrs. McIntire also expressed disappointment that, when she offered to assist Mrs. Ginsberg in maintaining the checkbook for KPC, Mrs. Ginsberg advised that she did not need any help. Against the foregoing background, we consider the evidence concerning the specific claims comprising the Count I judgment as that evidence bears on Mrs. Ginsberg.

There is no evidence that Mrs. Ginsberg had knowledge of the $20/s.f. lease any earlier than did Mrs. McIntire.

Dr. Ginsberg bases the reduction in his obligation to KPC for stock on a memorandum of special meeting of stockholders of KPC dated February 13, 1987, which is signed by Dr. Ginsberg and was prepared for signature by John McIntire or by his wife, but is unsigned. There is no evidence that Mrs. Ginsberg should have questioned those unsigned minutes any earlier than did Mrs. McIntire.

There was evidence that Mrs. Ginsberg accompanied Hendrickson to the builder's offices to review and verify the builder's cost figures for the improvements to the medical suite on the second floor. Hendrickson testified that there was an agreement between Dr. Ginsberg and Mr. McIntire under which Dr. Ginsberg would receive the $8/s.f. tenant standard allowance and that, in addition, Dr. Ginsberg would personally expend up to $100,000. If the build-out of the medical suite exceeded the combined amount, as it did by $45,632.77, then, as Hendrickson described the agreement, KPC would carry the amount as an open account until Dr. Ginsberg could pay. Thereafter, when Mrs. McIntire did not make loans to KPC to the same extent as did Dr. Ginsberg, the latter credited his excess "advances" against his obligation for excess build-out. Those credits were carried until 1994 when, on the advice of counsel, they were reversed.

Mrs. McIntire's position in the trial court did not challenge that there was a special arrangement concerning Dr. Ginsberg's build-out, but she did question the length of time the

$45,632.77 obligation to KPC remained outstanding and the lack of any interest payments while KPC was carrying this loan to Dr. Ginsberg. Mrs. McIntire claimed that the principal amount should have been paid by January 1, 1990. The jury agreed and awarded $45,632.77 to KPC with interest from January 1, 1990, compounded at eight percent per annum.[3]

Appellees' position in this Court is that Mrs. Ginsberg should have collected the debt due to KPC from her husband. But the evidence is that Dr. Ginsberg was paying on the debt by crediting the excess of his advances over those of the other fifty percent stockholder and that by this method the principal was reduced to about $24,000. The record does not inform us of the reason why counsel advised reversing those credits in 1994, and there is no basis in the evidence for considering that Mrs. Ginsberg should have anticipated that advice. Consequently, there is insufficient evidence to hold Ms. Ginsberg liable on the claim for non-payment of the excess build-out.

The jury also found Mrs. Ginsberg liable for the failure to collect passthroughs from the P.A. and from the other tenants. Dr. Ginsberg testified that early in 1988 he and Mrs. McIntire agreed to split the passthroughs, that is, each of the two owners would absorb the expenses that otherwise could be passed on to the tenants as additional rent. Dr. Ginsberg said that the agreement recognized that Merrill Lynch was paying a very high rent, and the owners did not want to increase that rent by charging the passthroughs as well. With respect to the second floor, he said that the agreement recognized his services in managing the building.

Mrs. McIntire testified in rebuttal that there was no agreement to forego passthroughs, and the jury believed Mrs. McIntire. There is no direct evidence as to what explanation, if any, was given to Mrs. Ginsberg with respect to the non-payment of passthroughs. Mrs. McIntire chose not to call

---

**3.** No issue concerning the computation of damages is presented in this appeal.

Mrs. Ginsberg as an adverse witness in order to explore Mrs. Ginsberg's knowledge of the details of KPC's business. On the record before us the jury could only speculate whether Mrs. Ginsberg was knowingly aiding and abetting Dr. Ginsberg in violating the rights of the other shareholder or whether Mrs. Ginsberg in good faith believed that the arrangement between her husband and Mrs. McIntire was as described by him in his testimony.

The core of Mrs. McIntire's argument for liability of Mrs. Ginsberg on the claims reviewed above is that Mrs. Ginsberg had a duty to collect monies due to the corporation. Here, a determination of whether monies were due to KPC involved a credibility determination adverse to Mrs. Ginsberg's husband. She was thus in a position of conflicting interests, but she was put in that position with the approval of John McIntire, acting as one of the two directors of KPC. This divided loyalty does not in and of itself constitute a breach of duty by Mrs. Ginsberg as treasurer. *Compare Goldman v. Rubin*, 292 Md. 693, 708, 441 A.2d 713, 722 (1982) (appointment as personal representatives by testator of four of the five directors of the corporation founded by testator caused personal representatives to deal with themselves as directors "as inexorably as if the will had expressly so directed"). Further, Mrs. Ginsberg was not in a position, acting alone, to bring an action in the name of the corporation or to cause the corporation to sue its president, sole surviving director, and fifty percent stockholder.

The judgment against Mrs. Ginsberg also includes a claim that KPC paid an amount of interest on its refinanced loans that was beyond that supportable by a proper business judgment, and the claim includes interest on that excess interest. There is no evidence that Mrs. Ginsberg negotiated those loans, or recommended them to the corporation, or had the authority to commit the corporation to those loans.

For the foregoing reasons, the judgment against Mrs. Ginsberg will be reversed.

## IV

Prior to opening statements the defense moved *in limine* "that if [Thompson] testifies that there be no reference to his present occupation in his testimony." [4]  The expressed concern was that this would prejudice the jury.  The court denied the motion, observing that "[a]ll witnesses who come and take the stand bring with them whatever history, background or the like they have."  Appellants contend that the ruling was erroneous and that the resulting repeated references to Thompson as Judge Thompson so improperly prejudiced the jury that a new trial is required.

■ Mrs. McIntire's threshold response is that a motion *in limine* does not preserve the issue for appeal.  She contends that it was necessary for the defendants to object at the time the references to Judge Thompson were made.  We do not agree.  That which the motion contemplated would happen did in fact happen.  Inasmuch as the court had already ruled that it would not prevent the jury from learning that Thompson had become a judge of the Circuit Court for Montgomery County, there was no need for the defense to insist on the court's reiterating the same ruling when Thompson was referred to as a judge, unless counsel considered that the particular circumstances created some special prejudice.

■ In opening statement counsel for Mrs. McIntire referred to Judge Thompson.  By way of example we set forth the following passage:

"[Powell], after the aborted foreclosure sale, hires a lawyer in Montgomery County named Durke Thompson. Durke Thompson is now a Circuit Court judge, as is Judge Beard [the trial judge].  Judge Thompson is going to testify in this trial.

"And Judge Thompson, then Mr. Thompson, is saying to the bank, everybody is saying to Ginsberg and their law-

---

**4.**  The motion was made by counsel for Mrs. Ginsberg, but, inasmuch as the motion, if granted, would benefit all defendants, we consider that all non-nominal defendants joined in the motion.

yers, where is the lease?  Do not know, does not matter, same terms.

"Thompson is saying to the bank and the bank's lawyers, do you have a copy of this lease?  This lease here?  The bank is saying, no, we do not have anything like that.  And ultimately, Judge Thompson was suspicious, as was Mr. Powell."

In the opening statement on behalf of Dr. Ginsberg, his counsel said:

"At which point, Durke Thompson, who is now a Judge, but was then an attorney, files a petition to take a deposition at the bank.  Everybody knows in advance that the lease is coming up at this deposition.

"It is in the files.  It is not someone who walks in with it at the last minute.  It is not a surprise.  We knew exactly what we were doing when we went there to get this deposition."

After Mrs. McIntire and Powell had testified, Thompson took the stand.  The introductory portion of his testimony is set forth below:

"[Mrs. McIntire's Counsel]: I call Judge Durke Thompson.

. . . .

"Q  Judge Thompson, good afternoon.

"A  Good afternoon.

"Q  Are you employed, sir?

"A  Yes, I am.

"Q  How are you employed?

"A  I am a judge here in the Circuit Court for Montgomery County.

"Q  The same court that we are in, like Judge Beard?

"A  Yes.

"Q  All right.

"A  Right upstairs, in fact.

"Q  And how long have you been a Circuit Court judge?

"A    It will be two years this minute [sic].

"Q    Prior to your appointment as a Circuit Court judge in the Circuit Court for Montgomery County, did you have occasion to represent Mrs. Virginia McIntire?

"A    Yes, I did.

"Q    ... You are here pursuant to subpoena?    Is that accurate?

"A    That is correct.

"Q    And it is your order to be here just like anybody else?

"A    That is correct."

With but one exception there was no objection to the substance of Thompson's testimony on direct.    The objection was sustained to Thompson's statement that it struck him as "unusual" that the February 21, 1987 lease was not with the other documents in Citizens' file.

On cross-examination, the first words from Dr. Ginsberg's counsel were, "Judge Thompson."    On cross by counsel for Mrs. Ginsberg, the first words were, "Two questions.    Judge, good afternoon."

A principal defense in this case was limitations.    The trial court submitted that issue to the jury, instructing that damages could not be awarded for wrongs that could reasonably have been discovered before June 1991.

In the opening phase of final arguments for the plaintiffs, Mrs. McIntire's counsel argued that the lease dated September 1, 1987, was not in fact prepared until after John McIntire's death.    In the course of that argument counsel submitted:

"[H]ow willing [was Dr. Ginsberg] to answer just a simple question [with] a simple answer, yes, no, I do not know, as opposed to a story which was completely motivated by Durke Thompson's discovery of this document, Judge Thompson?

"If Judge Thompson had not discovered this document, [Dr. Ginsberg] would have gotten away with it.    Now, not

only that, but his story on this transaction on the 21st is impossible. It could not have happened that way."

Further:

"Never once, ever, until this dispute started, after Durke Thompson had discovered that document, did [Dr. Ginsberg] ever talk about a $16 ... lease to the outside world, never once and never once."

Counsel for Mrs. Ginsberg made the summation on behalf of all defendants. Of relevance to the restrictions sought by the motion *in limine* is the following passage from that argument:

"The plaintiff called Judge Thompson, and I have no disagreement with what that man did. Judge Thompson inquired of the bank to see if they had any leases other than this $16 lease, and I do not think they would respond to him.

. . . .

"So Judge Thompson was a lawyer. He took a records deposition . . . .

"He succeeded where the doctor did not. Judge Thompson did the right thing. He found the document. It is the same document that Dr. Ginsberg was looking for. Remember, he signed it. He gave it to Mr. McIntire. He did not know what happened to it, and it has been seven years."

The prohibition which the defendants sought by their motion *in limine* is well removed from the central prohibitions against judicial testimony. Maryland Rule 5–605 states flatly that "[t]he judge presiding at the trial may not testify in that trial as a witness. No objection need be made in order to preserve the point." *See also* Fed.R.Evid. 605.[5] Maryland Rule 16–813, the Maryland Code of Judicial Conduct, Canon 2 B, in part provides: "A judge should not use the prestige of judicial office to advance the private interests of others . . . . A judge should not testify voluntarily as a character witness."

---

**5.** These rules effect a 180–degree alteration from the early common law. 6 Wigmore, *Evidence* § 1909, at 761 (Chadbourn rev.1976), states: "That a judge may give testimony as a witness in a trial before a court of which he is a member seems in the classical English practice not to have been doubted, though the precedents are scanty."

The commentary to Canon 2 B points out that, "[t]he testimony of a judge as a character witness injects the prestige of judicial office into the proceeding in which a judge testifies and may be misunderstood to be an official testimonial."

Canon 2, in its various manifestations in our sister states, has been used as the starting point for analysis of issues concerning testimony by judges. For example, in *Fuller v. Wolters*, 119 Idaho 415, 807 P.2d 633 (1991), relied upon by Dr. Ginsberg, the Canon stated that " '[e]xcept in a proceeding involving him personally or in response to an official summons, a judge shall not testify as witness in any court proceeding.' " *Fuller*, 807 P.2d at 639. In that case the trial court had prohibited two judges who were under subpoena for the defense in a legal malpractice case from testifying as to their opinion of the competence of the attorney who was sued. *Id.* The trial court was held not to have abused its discretion because it had

"correctly considered the danger of unfair prejudice which could result if a judge testifies. A judge brings the authority of his office to the stand, and jurors might be likely to give greater weight to his testimony than to the testimony of other witnesses. Furthermore, the trial court reached his conclusion 'with consideration that other competent experts who are not sitting judges may be called by counter-defendant's attorneys to assist the jury in issues they must decide.' "

*Id.*

It has also been held to be "prejudicial to one party for a judge to testify as an expert witness on behalf of the other party with respect to matters that took place before him in his judicial capacity." *Merritt v. Reserve Ins. Co.*, 34 Cal.App.3d 858, 883, 110 Cal.Rptr. 511, 528 (1973) (bad faith failure to settle). In reliance on *Merritt, Cornett v. Johnson*, 571 N.E.2d 572 (Ind.Ct.App.1991), held that a judge who heard the action underlying a legal malpractice action should not testify in the subsequent suit. *Id.* at 575. Similarly, *McCool v. Gehret*, 657 A.2d 269 (Del.1995), held that, at the trial of a

severed claim for tortious interference, based on witness intimidation, the judge who presided over a prior proceeding should not testify that, in the judge's opinion, the witness was very effective at the prior proceeding. *Id.* at 278–81. Similarly, in an action for legal malpractice in defending a prosecution, the judge who presided over the criminal trial and who was to testify that the government's case was weak, was properly excluded as a witness. *See Battle v. Thornton,* 646 A.2d 315, 325 (D.C.1994). Relying on the commentary to Canon 2 B, the court in *State v. Grimes,* 235 N.J.Super. 75, 561 A.2d 647, *cert. denied,* 118 N.J. 222, 570 A.2d 976 (1989), held that a judge could not be an expert witness on an issue of local law, even if that testimony were otherwise admissible. *Grimes,* 561 A.2d at 649–50.

In *Joachim v. Chambers,* 815 S.W.2d 234 (Tex.1991), a legal malpractice case, the court held that "[a] judge who testifies as an expert witness for a private litigant provides more than evidence; the judge also confers the prestige and credibility of judicial office to that litigant's position, just as a judge who testifies to the litigant's character." *Id.* at 238. In a bad faith failure to settle case the Supreme Court of Appeals of Virginia spoke of the "air of unfairness [that] crept into the trial below" when the United States district judge who had heard the underlying action testified for the plaintiff and advised the jury that he had been appointed by the President of the United States and confirmed by the United States Senate. *Aetna Cas. & Sur. Co. v. Price,* 206 Va. 749, 760, 146 S.E.2d 220, 227 (1966).

Reversing a judgment for the defendant in a legal malpractice case, the court in *Helmbrecht v. St. Paul Ins. Co.,* 117 Wis.2d 74, 343 N.W.2d 132 (Ct.App.1983), *aff'd in part and rev'd in part on other grounds,* 122 Wis.2d 94, 362 N.W.2d 118 (1985), referred to the danger that the jury would give undue weight to the testimony of the judge who had tried the underlying action. *Helmbrecht,* 343 N.W.2d at 135. The court concluded that judges should not be permitted to testify as expert witnesses because judges should be impartial but expert witnesses frequently appear to be advocates. *Id.*

When a judge is subpoenaed as a fact witness, however, the prohibitions are not nearly as stringent. An example is *United States v. Frankenthal,* 582 F.2d 1102 (7th Cir.1978), where the Government called in rebuttal the judge who had previously been assigned to the case but who had recused after a longtime family friend of the defendants engaged the judge in conversation about the case. *Id.* at 1105–06. The friend testified for the defense and, on cross-examination, admitted telling the judge that a trial of the case, as scheduled, would hurt the defendants' business, but the witness denied discussing the outcome of the trial. *Id.* at 1105. On rebuttal the judge testified that the witness was concerned about the effect of a conviction on the business. *Id.* at 1106. Rejecting an argument that the probative value of the judge's testimony was outweighed by the unfair prejudice derived from the authority and prestige of the judge's office, the court pointed out that the judge gave only factual testimony and emphasized that the judge, "possessed factual knowledge that was highly pertinent to the jury's task, and he was the only possible source of testimony on that knowledge." *Id.* at 1108. Nevertheless, the court did agree with the defendants "to the extent that calling a judge to give testimony in any proceeding is a very delicate matter." *Id.* at 1107.

Other cases considering testimony by a judge concerning earlier proceedings over which the judge had presided also have cautioned against calling a judge as a witness. The Colorado intermediate court in *People v. Drake,* 841 P.2d 364 (Colo.Ct.App.1992), articulated a standard of necessity, saying:

"[T]here is no statutory or ethical prohibition in Colorado preventing a judge from testifying as a witness in a case not on trial before that judge *about matters arising in a former trial over which that judge presided.* Nevertheless, given the weight to which a jury might accord such evidence and given the judge's other duties, we view the practice of doing so as one which should be sparingly used and only when the proponent of the evidence shows that the judge's testimony is not only relevant but also *necessary* to prove a material element of the case."

*Id.* at 368. There, in a prosecution for perjury of a witness at a prior trial, the state called the judge who presided over that trial to testify as to the material issues. *Id.* at 367. Because those issues could have been proved by other evidence, the appellate court concluded that there had been no necessity to call the judge. *Id.* at 368. This was not plain error, however, inasmuch as the defense was duress. *Id. Drake* 's standard was quoted favorably in *Battle,* 646 A.2d at 325.

Much the same approach has been taken by the Supreme Court of Connecticut. In *Gold v. Warden, State Prison,* 222 Conn. 312, 610 A.2d 1153 (1992), a prisoner petitioning for habeas corpus relief contended that he was incompetent at the time of his conviction, *Gold,* 610 A.2d at 1154, and the state called the judge who had presided over the criminal trial to testify as to the petitioner's demeanor at that trial. *Id.* at 1156. The court recognized that "[a] judge is not disqualified and is a competent witness to testify at a new trial or collateral proceeding to observed facts that occurred before him or her at a former trial or proceeding," *id.* at 1157, and that "an examination of the mental processes of a judge in arriving at a judicial decision should not be permitted." *Id.* n. 11. Further, the court said that "[w]e do not encourage the calling of a judge as a witness in subsequent proceedings in a case over which the judge presided. Where there is a compelling need for a judge's testimony as to observed facts in order that justice be done, however, a judge is a competent witness and should not be precluded from testifying." *Id.* at 1157 (citation omitted). Because the judge-witness had been afforded "a unique opportunity to observe the petitioner's demeanor throughout the entire trial," there was a "compelling need" for the judge to testify in the habeas corpus proceeding. *Id.*

More analogous factually to the case now before us is *People v. Jordan,* 205 Ill.App.3d 116, 150 Ill.Dec. 415, 562 N.E.2d 1218 (1990), *appeal denied,* 136 Ill.2d 549, 153 Ill.Dec. 379, 567 N.E.2d 337 (1991). *Jordan* was a prosecution for the rape and murder of an eleven-year-old child. *Jordan,* 150 Ill.Dec. at 416, 562 N.E.2d at 1219. The accused had confess-

ed to a prosecuting attorney who became a circuit court judge before the criminal case came to trial. *Id.* at 417, 562 N.E.2d at 1220. By motion *in limine* the accused unsuccessfully sought to prevent the jury from being told that the former prosecutor-witness was employed as a judge. *Id.* at 418, 562 N.E.2d at 1221. This denial was affirmed on appeal on the following rationale:

> "In the present case, we cannot say that the trial court manifestly abused its discretion in denying defendant's motion *in limine.* Certainly, the jury was entitled to know that [the former prosecutor] was now employed as an associate judge in Du Page County. The reason for this is that the witness' occupation and related background is of value to the jury in determining the credibility of the witness and his testimony."

*Id.*

Although the motion *in limine* in *Jordan* was denied, the trial court instructed the state not to refer to the witness as judge. *Id.* During direct examination of the witness the state referred to him as "judge" nine times and in final argument referred to the witness as judge four times. *Id.* On appeal the defendant argued that the cumulative effect of these references was improperly prejudicial. *Id.* This argument was not successful because the jury knew the witness's occupation and because the defense had also referred to the witness as a judge. *Id.* at 419, 562 N.E.2d at 1222.

In the instant matter the testimony elicited from witness Thompson did not concern any judicial activity of Judge Thompson. His testimony was limited to factual matters that were relevant to the case and that occurred while he was practicing law. The evidence, however, that the $20/s.f. lease was first obtained on a records deposition to perpetuate evidence was available from sources other than Thompson. Indeed, the deponent, the custodian of records at Citizens, testified to the same facts, but this does not mean that the evidence given by and through Thompson was unnecessary and that he should not have been called. The principal

defense in this case was the statute of limitations, inasmuch as Dr. Ginsberg had been paying $16/s.f. rent since 1987. There was evidence that Hendrickson annually reviewed the general ledger with Mrs. McIntire, but Mrs. McIntire did not sue until 1994. Faced with a serious limitations problem, Mrs. McIntire was not required to try her case in a sterile fashion. She was entitled to present the evidence through the attorney who was hired to search for the February 21 lease and thus emphasize the difficulty of the investigation as a justification for the delay. The fact that the attorney had become a judge in the interim did not preclude this tactic.

Inasmuch as Mrs. McIntire had a right to call her former attorney as a fact witness, the jury was entitled to hear that the witness was, at the time of testifying, a circuit court judge in Montgomery County. It is simply a part of the customary, preliminary background examination of any fact witness. What we said in *Baltimore v. Zell*, 279 Md. 23, 367 A.2d 14 (1977), is apropos here:

"It is a routine practice in trials for an attorney to ask his witness certain preliminary questions which may not be relevant to the issues being litigated, which may go beyond mere identification and which are designed to show that the witness will be somewhat credible or not biased in favor of the side calling him. For example, the educational background or professional status or employment position of a non-expert witness may be asked, or the witness's lack of prior contact with the side who has called him may be brought out. These questions give the jury some knowledge of the individual and a more complete perspective in considering his testimony."

*Id.* at 28, 367 A.2d at 17.

We point out that the issue under review is the denial of the defendants' motion *in limine*. During opening statements, the eliciting of evidence, and final argument, both sides repeatedly referred to "Judge" Thompson, but the defendants did not object to any of these references by Mrs. McIntire. Thus, the defendants did not consider that the particular

circumstances surrounding the use of the title, "judge," on any particular occasion caused the use of the title to be any more prejudicial than had been indicated in the argument in support of the motion *in limine.*

## V

We summarize.

●Judgment against Dr. Ginsberg for compensatory damages of $1,049,852.87 on Count I in favor of KPC and for punitive damages of $360,000 on Count III in favor of Mrs. McIntire are affirmed.

●Judgment against Mrs. Ginsberg on Count I is reversed.

●Judgment against the P.A. for compensatory damages of $236,812.52 (including $36,980 in attorney's fees and $2,979.27 in expenses) in favor of KPC on Count II is affirmed. The extent to which any satisfaction of the judgment against the P.A., in whole or in part, operates as satisfaction of the judgment against Dr. Ginsberg is not ripe.

*JUDGMENTS OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AGAINST APPELLANTS, STEPHEN P. GINSBERG AND STEPHEN P. GINSBERG, M.D., P.A., ARE AFFIRMED. JUDGMENT AGAINST APPELLANT, RUTH GINSBERG, IS REVERSED. COSTS TO BE PAID SIXTY–SIX AND TWO–THIRDS PERCENT BY THE AP-PELLANTS, STEPHEN P. GINSBERG AND STEPHEN P. GINSBERG, M.D., P.A., AND THIRTY–THREE AND ONE–THIRD PERCENT BY VIRGINIA A. McINTIRE, ONE OF THE APPELLEES.*

ELDRIDGE, J., concurs in the result only.

### ON MOTION FOR RECONSIDERATION

Dr. Ginsberg has moved for reconsideration, limited to the judgment for punitive damages of $360,000 entered by the Clerk of the Circuit Court for Montgomery County as a judgment in favor of Mrs. McIntire. Dr. Ginsberg avers that

this judgment was mistakenly entered in favor of Mrs. McIntire and should be modified to a judgment in favor of KPC. He seeks leave from this Court to file a motion under Rule 2-535(d) in the Circuit Court for Montgomery County in order to have that court correct the name of the party in whose favor the judgment for punitive damages was entered.

Now, therefore, it is this 6th day of February, 1998, by the Court of Appeals of Maryland

ORDERED that Part V of the opinion and the mandate in the above-referenced appeal are modified to read as follows:

"V

"We summarize.

"⊕Judgment against Dr. Ginsberg for compensatory damages of $1,049,852.87 on Count I in favor of KPC is affirmed.

"⊖Judgment against Dr. Ginsberg for punitive damages of $360,000 on Count III is remanded, without affirmance or reversal, in order to rule on a motion by Dr. Ginsberg pursuant to Rule 2-535(d) seeking the relief described above.

"⊘Judgment against Mrs. Ginsberg on Count I is reversed.

"⊙Judgment against the P.A. for compensatory damages of $236,812.52 (including $36,980 in attorney's fees and $2,979.27 in expenses) in favor of KPC on Count II is affirmed. The extent to which any satisfaction of the judgment against the P.A., in whole or in part, operates as satisfaction of the judgment against Dr. Ginsberg is not ripe.

"*JUDGMENTS OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AGAINST APPELLANT, STEPHEN P. GINSBERG, ON COUNT I AND AGAINST STEPHEN P. GINSBERG, M.D., P.A., ON COUNT II ARE AFFIRMED.*

"*JUDGMENT AGAINST STEPHEN P. GINSBERG FOR PUNITIVE DAMAGES ON COUNT III IS REMANDED, WITHOUT AFFIRMANCE OR REVERSAL, FOR FUR-*

*THER PROCEEDINGS CONSISTENT WITH THIS OPIN-
ION ON MOTION FOR RECONSIDERATION.*

*"JUDGMENT AGAINST APPELLANT, RUTH GINS-
BERG, IS REVERSED.*

*"COSTS TO BE PAID SIXTY–SIX AND TWO–THIRDS
PERCENT BY STEPHEN P. GINSBERG AND STEPHEN
P. GINSBERG, M.D., P.A., AND THIRTY–THREE AND
ONE–THIRD PERCENT BY VIRGINIA A. McINTIRE,
ONE OF THE APPELLEES.*