Argued and submitted February 26, 2002, affirmed June 12, petition for review denied September 24, 2003 (336 Or 16)

Joseph SANSONE,
an individual,
*Plaintiff,*

*and*

JOSEPH C. SANSONE COMPANY,
fka Property Tax Research Company,
a Missouri corporation;
Property Tax Research Brokerage Company,
an Oregon corporation;
Property Tax Research Appraisal Company
an Oregon corporation,
*Respondents,*

*v.*

GARVEY, SCHUBERT & BARER,
a law partnership,
*Appellant.*

9810-07633; A110499

71 P3d 124

---

William B. Crow argued the cause for appellant. With him on the briefs were William H. Walters and Miller Nash LLP.

Maureen Leonard argued the cause for respondents. With her on the brief were Jan Baisch and Baisch & Coletti, P.C.

Before Edmonds, Presiding Judge, and Linder and Wollheim, Judges.

LINDER, J.

**LINDER, J.**

This is a legal malpractice action arising out of an employment dispute between plaintiff Joseph C. Sansone Company (Sansone)[1] and two of its employees. In the underlying employment dispute, Sansone was originally represented by defendant Garvey, Schubert & Barer (Garvey). Garvey later withdrew from the case, however, because its handling of the dispute gave rise to retaliation claims by the employees, thus creating a conflict of interest on its part. Eventually, Sansone and the lawyers who took over Sansone's representation settled the employees' case for $1.25 million after concluding that Garvey's representation had significantly increased Sansone's potential liability. Sansone then brought this malpractice action against Garvey. At trial, among other witnesses, Sansone called the circuit court judge who presided over the underlying trial of the employees' claim against Sansone. The jury returned a verdict in favor of Sansone, and Garvey appeals.

On appeal, the significant issues presented are whether a judge may be called as a witness in a legal malpractice action arising out of a trial over which the judge presided and, if so, the appropriate scope of the testimony that the judge may give. As we amplify below, we conclude that there is no legal principle that absolutely prevents a judge from testifying as a witness about matters arising in a former trial over which that judge presided. We further conclude that, in permitting the judge to testify in this case, the trial court exercised sound judgment as to the appropriate limitations to be placed on the scope of any such testimony. We therefore affirm.

## I. BACKGROUND

Joseph Sansone is the owner of Joseph C. Sansone Company, a company that represents property taxpayers before various taxing authorities throughout the United States.[2] Until 1997, Sansone provided those services in

---

[1] Plaintiffs include Joseph Sansone individually and Joseph C. Sansone Company. We refer to plaintiffs collectively as Sansone.

[2] We view the evidence and all reasonable inferences in the light most favorable to Sansone, who prevailed at trial. *Benjamin v. Wal-Mart Stores, Inc.*, 185 Or App 444, 446, 61 P3d 257 (2002).

Oregon through a company called Property Tax Research (PTR),[3] located in Portland. Patricia Rose and Catherine Gunnerson were PTR employees who worked out of the Portland office. In 1996, Rose and Gunnerson became concerned that PTR was permitting out-of-state employees to market the company's services in Oregon without first being licensed by the Oregon Real Estate Agency (REA), a practice they understood to violate Oregon law. Rose was also concerned that the practice jeopardized her real estate license. As a result, Rose and Gunnerson retained attorney Mark Morrell, who, after investigating Rose and Gunnerson's concerns, wrote a letter to Sansone outlining the allegedly unlawful practices. Morrell sent a similar letter to the REA.

Sansone sought counsel from Garvey attorney David Canary, who in the past had represented the company and its clients before taxing authorities in Oregon. On behalf of Sansone, Canary initially responded to Morrell regarding the Rose/Gunnerson matter. He later sought the assistance of his law partner Susan Coskey, whose practice focused on employment matters and who worked out of Garvey's Seattle office.

Following Rose and Gunnerson's report, the REA opened an investigation of PTR's practices. In the course of that investigation, the REA subpoenaed certain of PTR's documents and also subpoenaed PTR employees—including Rose and Gunnerson—for depositions. Canary represented PTR in the REA investigation. To prepare for the depositions and to comply with the REA document request, Canary met with Rose the day before the depositions were scheduled to take place. In the course of that meeting, he asked Rose to provide certain documents from PTR's Portland office, documents that Rose claimed she did not have or could not locate.

The next day, Canary, Rose, Gunnerson, and Morrell all gathered for the REA depositions. Based on an earlier conversation with an REA administrator, Canary expected to sit in on the depositions as PTR's attorney. When he learned that Gunnerson's deposition had begun without him, he forced his way into the hearing room, interrupted the

---

[3] The Portland office of PTR also included Property Tax Research Brokerage Company and Property Tax Research Appraisal Company. For ease of reference, we refer to those entities collectively as PTR.

proceedings, and demanded to participate. The assistant attorney general conducting the depositions refused to let Canary sit in on Gunnerson's or Rose's deposition. Canary returned to the waiting area where he later angrily confronted Rose without her lawyer present, calling her a thief and a liar. REA personnel eventually intervened and asked Canary to leave the area so that he would not disrupt REA business. According to one witness, that confrontation became "one of the best pieces of evidence to show retaliation" against Rose for reporting her concerns to the REA. Another witness acknowledged that the confrontation was a "huge component" of Rose's claims for emotional distress and reputational damages.

Meanwhile, Rose and Gunnerson's relationships with Sansone began to deteriorate. They both eventually took medical leave due to stress. While on leave, Rose and Gunnerson received memoranda from David Smith, a manager at Sansone, which had been drafted by Canary's law partner, Coskey. The memoranda questioned the reasons for their continued absence, warned them about their performance, and sought medical verification of their respective conditions. One memorandum accused both Rose and her attending physician of lying about Rose's medical condition. Another one asked Rose to attend a meeting with Smith and other Sansone managers to discuss each party's concerns regarding the employment relationship. On Coskey's advice, Smith also told Rose that her attorney could not accompany her to that meeting.

Eventually, Rose and Gunnerson resigned from their positions at PTR and filed complaints seeking damages based on whistleblower claims and actions for libel, intentional infliction of emotional distress, and common-law wrongful discharge. The claims were based, in part, on Canary's conduct at the REA depositions and Coskey's role in drafting the memorandum alleging that Rose and her doctor lied about her medical condition. Soon after filing the complaints, Rose and Gunnerson's trial lawyer, Steve Rizzo,[4] informed Garvey attorney Eric Lindenauer by letter that

---

[4] Rizzo was substituted for Morrell as Rose and Gunnerson's attorney after it became clear that the matter was likely to result in litigation.

Garvey's continued representation of Sansone in the employment action violated applicable disciplinary rules because Canary was likely to be called as a witness in Rose and Gunnerson's case against Sansone. In response, Garvey repeatedly denied that a conflict existed and refused to withdraw.

The litigation progressed and, as it did, the discovery phase became increasingly contentious. Garvey refused to comply with Rizzo's requests for production of PTR documents. In fact, Garvey resisted discovery requests to such a degree that Judge Charles Guinasso, who was overseeing discovery, intervened and ordered Garvey to produce nearly 40 boxes of documents immediately. Judge Guinasso took the extraordinary step of having the furniture removed from his office to store the large number of boxes, and considered dismissing Sansone's answer as a sanction for Garvey's discovery abuses.

The trial date was set for May 1998. In March, Garvey acknowledged the conflict of interest about which Rizzo had complained and, seven weeks before trial, withdrew from the case. Mark Wagner was substituted to represent Sansone. The case went to trial as scheduled, with Judge Ellen Rosenblum presiding, but not before plaintiffs turned down settlement offers of $300,000, $400,000, and $1,000,000. The trial ended up focusing principally on the conduct of the Garvey attorneys, with Canary's testimony, pursuant to subpoena, figuring foremost in the employees' case-in-chief.

Sansone's attorney, Wagner, estimated that the whistleblower case, in and of itself, had a core value of $50,000. But Wagner was convinced that, because of the evidence of the Garvey attorneys's conduct, Sansone "faced a huge exposure": "I knew we were going to lose. I knew there was a potential to lose very big." Wagner watched the trial unfold "just as [the plaintiffs' attorney] had hoped and planned," and he saw Sansone's "defense getting narrower and narrower." The problem was compounded by the demeanor of the witnesses on the stand. Mr. Sansone described the employees as presenting themselves as "very sincere and convincing." On the other hand, Canary

appeared to him during the trial to be "arrogant, lecturing to the jury, objecting to what the lawyers were asking, confront[ational] with the Judge," as well as "sullen" and unapologetic. The employees' attorney, Rizzo, had a similar impression, describing Canary as an "attacking witness" whose testimony marked a "turning point in the trial." According to Wagner, who on behalf of Sansone, tried to rehabilitate Canary on cross-examination, Canary was "a terrible witness" who was hostile and not contrite.

After the trial, while the jury deliberated, the parties reopened settlement discussions and sought the advice of Judge Rosenblum. In particular, they solicited her views on the progress of the trial, the likely verdict, and the reasonableness of their proposed settlement amount. After that consultation, the parties agreed to settle the case for $1.25 million.

Sansone then filed this legal malpractice action against Garvey, alleging that, as a result of Garvey's negligence, Sansone suffered damages in the amount of the settlement in the Rose/Gunnerson litigation and the attorney fees it paid to Garvey. In its answer to the complaint, Garvey asserted an affirmative defense of comparative negligence in which it alleged that Sansone's damages were caused by its own negligence in handling the underlying trial and in settling the Rose/Gunnerson litigation for what Garvey characterized as an "unreasonable sum." The case was tried by a jury, which returned a verdict of $1,415,000 for Sansone. This appeal followed.

## II. THE ADMISSIBILITY OF JUDGE ROSENBLUM'S TESTIMONY GENERALLY

As earlier noted, the principal issues on appeal involve the admissibility and appropriate scope of testimony by Judge Rosenblum, the circuit court judge who presided over the trial of the Rose/Gunnerson claims against Sansone. Garvey's first and second assignments of error present arguments relating to Judge Rosenblum's testimony as a whole.[5]

---

[5] Although Garvey makes four separate assignments of error relating to Judge Rosenblum's testimony, Garvey combines the argument on those assignments. *See* ORAP 5.45(6) (the argument in support of several assignments of error may be combined if the assignments present essentially the same legal question). Because

Garvey argues, first, that Judge Rosenblum should not have been permitted to testify at all in this malpractice case due to the "inherent credibility" associated with judges. Alternatively, but for the same reasons, Garvey argues that, even if Judge Rosenblum appropriately could testify, she should not have been permitted to offer opinion testimony. In other words, Garvey urges us to announce a *per se* rule that a judge who presided over prior litigation may not be a witness in a subsequent legal malpractice action arising out of that litigation or, at a minimum, that the judge may not offer opinion testimony of any kind. In arguing for those limitations, Garvey relies, as it did at trial, on OEC 605, OEC 403, and cases from other jurisdictions that, according to Garvey, uniformly have held that testimony of the kind presented by Judge Rosenblum is inadmissible.

A. *The trial court's ruling and Garvey's challenges to that ruling*

Before analyzing Garvey's arguments in greater detail, we first examine the trial court's ruling.[6] Before trial, Garvey was aware that Sansone intended to call three judges as witnesses: Judge Guinasso, who presided over discovery in the Rose/Gunnerson trial; Judge Rosenblum, who presided over the merits portion of that trial; and retired Justice Berkeley Lent, who had no connection with the prior litigation and was to be called as an expert on legal malpractice standards. Garvey filed a motion *in limine* objecting only to Judge Guinasso's and Judge Rosenblum's testimony (under both OEC 605 and OEC 403) because of their roles in presiding over the earlier litigation.[7] The trial court reserved its

---

we believe Garvey's third and fourth assignments of error present distinct questions from the first and second assignments of error, we discuss them separately.

[6] Garvey's brief does not set forth the trial court's ruling in full. *See* ORAP 5.45(4) (assignments of error must be followed by a section setting forth all portions of the record pertinent to the challenged ruling). The section of Garvey's brief that quotes the portions of the record pertinent to the first assignment of error describes only a portion of the trial court's ruling—*i.e.*, that the testimony would not violate OEC 605 and that it was not unfairly prejudicial. The portions of the record identified as pertinent to the second assignment of error contain no ruling at all, but quote only a small amount of the colloquy between the trial court and the counsel. In Garvey's statement of facts, Garvey describes additional portions of the colloquy between the parties and the judge, but that description omits the actual rulings that we describe.

[7] Garvey has raised no objection, either at trial or on appeal, to Justice Lent's testimony.

ruling until trial. At the outset of the trial, the trial court indicated that it was inclined to permit Judge Rosenblum to testify to facts but not to opinions. In particular, the trial court suggested that it anticipated allowing Judge Rosenblum to give factual descriptions of, for example, the witnesses' demeanor as they testified (*e.g.*, the witness "got angry, he contradicted himself, the longer he was on the witness stand, the more upset he got") but not opinion-based characterizations (*e.g.*, the witness "self-destructed" on the stand). Although it signaled what its later ruling likely would be, the trial court withheld a definitive ruling until further into the trial.

Midtrial, the parties and the trial court again took up the issue of whether Judges Guinasso and Rosenblum could testify at all and, if so, the proper scope of the testimony. Garvey reiterated its objections under OEC 403 and OEC 605 and urged that the testimony should be excluded as unfairly prejudicial given the witnesses' status as judges. Garvey also argued that the prejudice was unfair because there was no need for the judges to testify about the jury's reactions and "so forth" given that the three lawyers who tried the case, as well as Mr. Sansone, would be testifying about those matters.

At that point, the trial court ruled that, given Judge Rosenblum's neutral perspective in observing the Rose/ Gunnerson trial and her role in "brokering the settlement," her testimony was admissible and not cumulative. The trial court explained that, if Judge Rosenblum expressed to the attorneys her opinions about how the case had gone in order to facilitate the settlement, the fact that the attorneys had that information was particularly pertinent to the case. The trial court observed that, because Judge Rosenblum had a neutral role and no stake in the outcome of the litigation, her testimony would not be merely cumulative to that of the others who were in the courtroom and who might testify in the malpractice action. On the issue of prejudice, the trial court concluded:

"Now, I realize that comes close to what you're talking about. What makes it sort of unfair is that she's got that status as a judge as she testifies before this jury, but I don't

think that's unfairly prejudicial, and I would allow her to testify."

The trial court came to a different conclusion on the issue of whether Judge Guinasso should testify. Sansone intended to ask Judge Guinasso for his personal views of and reactions to Garvey's handling of discovery in the Rose/Gunnerson case. The trial court was satisfied that such testimony was irrelevant, would confuse the issues, and was akin to calling jurors or a presiding judge to testify whether they "would have ruled differently if certain things had happened."

As the colloquy progressed, Garvey's counsel emphasized that Garvey objected to Judge Rosenblum testifying at all. Garvey's counsel urged, alternatively, that, if Judge Rosenblum were to testify, the trial court should adhere to the distinction between fact-based and opinion-based testimony, letting in the former but not the latter:

"[I]t is entirely inappropriate for the judge to give an opinion, for example, as to her impression of which way the jury was leaning; her impression of the strength of one case as opposed to another, *as opposed to specific fact observations of a witness's demeanor or a juror's demeanor or reaction to a witness's testimony.*"

(Emphasis added.) Counsel's argument in that regard caused the trial court to refine its ruling further:

"[T]here are fine distinctions in so many areas in this case, and I think another one has just come up.

"If Judge Rosenblum expressed an opinion about how the case was going or how the jury was reacting to the lawyers as she discussed settlement with them or initiated settlement discussions, that's a fact. That's not, you know, a separate opinion here. But I would agree with you, her undisclosed opinions about whether it was going well or badly would be irrelevant unless—as opposed to, again, of her observations of people's behavior, but her—what she was thinking about, all that is irrelevant unless it was communicated, and if it was communicated, it becomes a fact, though I think the fact is, whether her opinion was right or wrong, that's the opinion she expressed. That would be a factor that the lawyers would consider and the parties would consider in their settlement negotiations, that the

judge has told them that she thinks it's going one way or another."

Garvey's counsel asked the trial court if it was ruling that Judge Rosenblum could testify to "her opinions in the courtroom prior to the jury going out about how she saw the case going[.]" The trial court emphasized that its ruling was much more narrow: "Only to the extent [that Judge Rosenblum] expressed opinions to the people who made the decisions about settlement. Any undisclosed opinions she may have had I don't think are relevant."

Thus, the trial court ruled that Judge Rosenblum could testify, but that her testimony would be limited to factual observations about the demeanor of the witnesses and reactions of the jurors that would either confirm, or not confirm, Sansone's impressions of the case, which were relevant to whether Sansone settled for an unreasonable amount, as Garvey intended to prove. The only "opinions" that Judge Rosenblum would be permitted to offer were those communicated to the attorneys for their consideration in settlement negotiations, because her communication of any such opinions were themselves *facts* relevant to the circumstances as Sansone understood them when it decided to settle the Rose/ Gunnerson litigation.

In addition to imposing that limitation on Judge Rosenblum's testimony, the trial court took steps to ensure that the jury understood that Judge Rosenblum was there as a witness, not a judge, thus minimizing the prejudice that concerned Garvey. In particular, immediately before Judge Rosenblum took the stand, the trial court cautioned the jury as follows:

> "Members of the jury, this is a bit of an unusual event here. You have heard that this witness is a judge in Multnomah County, and you'll hear more about that in a moment. She is testifying today as a witness to the events that she observed in the underlying trial * * *. In our trial courts, we have normally one judge who's making the rulings, and in this case you will notice I'm still one step above Judge Rosenblum. She's here as a witness. I'm still your trial judge. She is entitled, however, to be referred to as a judge wherever she is."

During Judge Rosenblum's testimony, the trial court adhered to the boundaries established by its ruling. Whenever Garvey objected to a question that suggested a response other than a factual observation, the trial court sustained the objection and required that the question be rephrased to elicit a factual response. Thus, for example, the trial court sustained an objection to a question that called for Judge Rosenblum to offer opinion testimony about Mr. Sansone. In response, the question was rephrased and Judge Rosenblum testified, without further objection, that Mr. Sansone was "well spoken," "pleasant," and "a good witness."[8] In contrast, when Judge Rosenblum described Rose and Gunnerson as "honest," "sincere," "likeable," and "good witnesses," Garvey did object. In response, the trial court sustained the objection and told the jury to disregard Judge Rosenblum's answer. Judge Rosenblum also testified to her opinions of the effect that the witnesses had on the case and to the reasonableness of the settlement itself given how the trial had gone; but she was permitted to express those opinions only to the extent that they were communicated to the lawyers during the settlement negotiations.[9]

After the evidentiary portion of the trial, when the trial court instructed the jury, the trial court again sought to minimize the prejudice that concerned Garvey. In the instructions, the trial court reminded the jury that "[t]he judges who testified in this trial appeared before you as witnesses, not as judges. You must evaluate their testimony as witnesses."

In short, the trial court carefully set narrow boundaries on the scope of Judge Rosenblum's testimony. Throughout the trial, whenever Garvey believed those boundaries

---

[8] The same thing occurred when Judge Rosenblum was asked about some of her observations of Canary as a witness. Counsel first objected to the form of the question, which invited the witness to testify about "nuances" she observed in Canary's demeanor. The question was rephrased to ask Judge Rosenblum about her observation of Canary's "expressions during the trial, the way he testified." Garvey did not object further, either to the rephrased question or to the answer that Canary was "glib," "didn't answer the questions directly," "was very defensive," and tended to give unresponsive answers.

[9] The testimony in that regard is the subject of Garvey's third assignment of error and is described in greater detail later.

had been exceeded and objected on that ground, the trial court, if it agreed, sustained the objections. On appeal, for purposes of its first and second assignments of error, Garvey does not challenge any specific rulings on particular questions and answers during Judge Rosenblum's testimony. Nor does Garvey make any claim that the trial court ruled inconsistently with the limitations it announced in advance of Judge Rosenblum's testimony. Thus, those assignments of error present us with only two issues: (1) Did the trial court correctly permit Judge Rosenblum to testify at all; and (2) did the trial court correctly permit Judge Rosenblum to offer opinions that were communicated to the lawyers during the settlement negotiations in the Rose/Gunnerson litigation?

B. *Garvey's challenge under OEC 605*

■■ We begin with Garvey's reliance on OEC 605, which we readily conclude does not support a limitation of any kind on the challenged testimony in this case. That rule of evidence states, in part, that "[t]he judge presiding at the trial may not testify in *that trial* as a witness." (Emphasis added.) Thus, by its express terms, OEC 605 prohibits a judge from testifying only in a case over which the judge is currently presiding, not in other cases. *See Larson v. Naslund*, 73 Or App 699, 703, 700 P2d 276 (1985) (OEC 605 "does not preclude testimony by a judge in a separate proceeding"). Put simply, the rule imposes no limitation on a judge's testimony in a circumstance such as this, as the trial court correctly concluded.

C. *Garvey's challenge under OEC 403*

■ Garvey next relies on OEC 403, which provides more generally that evidence, although relevant,

> "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

Garvey argues, as it did to the trial court, that permitting a judge to testify in a circumstance such as this is "highly prejudicial * * * given the inherent credibility associated with judges." The trial court agreed that Judge Rosenblum's testimony would be prejudicial to Garvey to some degree. But it did not agree it would be unfairly so. On appeal, we review

the trial court's ruling only for an abuse of discretion. *Dept. of Trans. v. Alf*, 165 Or App 162, 167, 995 P2d 1197, *rev den*, 330 Or 470 (2000).

■■ At the outset, it is worth emphasizing that the fact that evidence is highly persuasive or powerfully convincing is not a basis for deeming it to be "unfairly prejudicial." The admission of relevant evidence often has the effect of being "harmful, even devastating," to one party's position. *Macy v. Blatchford*, 330 Or 444, 455, 8 P3d 204 (2000). That reality is not, in and of itself, a ground for objection. Rather, to be excluded as "unfairly" prejudicial, evidence must tend to persuade the jury to decide a case based on reasons unrelated to the issues being litigated at trial. *Persad v. Kaiser Foundation Hospital, Inc.*, 106 Or App 615, 619, 809 P2d 706, *rev den*, 312 Or 80 (1991). In other words, the unfairness that OEC 403 seeks to prevent is not the admission of evidence that is damaging to the objecting party's case; instead, it is the unfairness of having the case decided on bases that are not legitimate for the jury to consider.

In this case, Garvey's concern about the prejudicial effect of the challenged testimony arises not from the substance of the testimony but from the identity of the witness who provided it. As a matter of *substance*, Judge Rosenblum's testimony did not suggest to the jury a basis for deciding the case that was unrelated to the issues being litigated at trial, and Garvey does not argue otherwise. Garvey's exclusive objection relates to the form of the testimony—*i.e.*, due to the "inherent credibility associated with judges," the jury would overvalue or give undue weight to the testimony because of the person who provides it.

We know of no instance in which OEC 403 has been used as a vehicle to declare an entire class of witnesses (*e.g.*, judges who presided over past cases) to be, in effect, incompetent to testify in an entire class of cases (*e.g.*, cases involving issues that arose out of litigation over which the judge presided). Nor are we aware of any case holding that "unfair" prejudice arises when a jury may find an eyewitness to certain events to be especially believable because of that person's professional position or community stature. Such an approach to evidence under OEC 403 has broad-reaching

implications. Logically, for example, the same "inherent credibility" argument could be made for any number of other classes of persons or professionals, such as clergy, government officials, doctors, police officers, firefighters, celebrities, or others who, depending on the circumstances and the context involved, may be held in particularly high esteem in the community. Garvey provides no limiting principle to explain why we should leave questions of weight and credibility in those instances to the ordinary testing mechanisms of a trial, while we should establish a *per se* rule excluding the testimony of judges as a matter of law.

Cases involving challenges to scientific evidence under OEC 403 provide a helpful analogue, however. The problem that arises with scientific evidence is that the weight juries tend to give such evidence is not always justified by the scientific validity of the evidence itself. As the Oregon Supreme Court has described the dilemma, "[e]vidence perceived by lay jurors to be scientific in nature possesses an unusually high degree of persuasive power" despite the fact that "[t]he value of proffered expert scientific testimony critically depends on the scientific validity of the general propositions utilized by the expert." *State v. O'Key*, 321 Or 285, 291, 899 P2d 663 (1995). To protect the integrity of the decision-making process in cases involving scientific evidence, the court has articulated a multipronged test designed to establish the scientific validity of the evidence involved. *Id.* at 299 (outlining factors first announced in *State v. Brown*, 297 Or 404, 417, 687 P2d 751 (1984)). In other words, under OEC 403, a trial court appropriately performs a "gatekeeping" function to ensure that the "inherent credibility" that may attach to scientific evidence is not out of proportion to the relevance and reliability of that evidence. *See id.* at 300-07.

Garvey asks us to perform a very different gatekeeping function in this case. Garvey makes no argument that the factual observations of a judge presiding over litigation are somehow of more questionable reliability than those of other individuals. Nor does Garvey argue that a judge presiding over litigation has an impaired ability to perceive, recall, and relate as compared to other witnesses. In other words, Garvey's argument is not that the probative value of *the substance* of Judge Rosenblum's testimony is too little. It is,

instead, only that a judge's credibility is too great, irrespective of the probative value of the substance of the judge's testimony. Put simply, we do not agree that OEC 403 is the source of a legal principle that excludes probative and reliable testimony *as a matter of law* because of the inherent credibility of the person presenting the testimony.

■ As a result, this was a discretionary call for the trial court. The trial court made a carefully tailored decision, narrowing the permissible scope of Judge Rosenblum's testimony to (1) factual observations of the witnesses and jurors during the Rose/Gunnerson trial; and (2) opinions that she communicated to the trial attorneys during settlement negotiations because those qualified as "facts" pertaining to what the trial attorneys knew and when they knew it. In admitting the testimony on those terms, the trial court specifically observed that the testimony was not cumulative, because Judge Rosenblum was uniquely positioned as a witness. That is, unlike all other witnesses who might testify to the same matters, she had no personal stake in the underlying litigation or in the malpractice action. The trial court took particular care in instructing the jury so that it would understand that Judge Rosenblum was testifying as a witness, not as a judge. Given the trial court's management of the testimony, we cannot conclude as a matter of law that there was any "unfair" prejudice at all, let alone unfair prejudice that outweighed the probative value of the evidence. The trial court appropriately exercised the discretion that OEC 403 calls on a trial court to exercise.

### D. *Garvey's argument for a public policy-based limitation*

■ Garvey's final argument in connection with its first and second assignments of error is that, even if neither OEC 605 nor OEC 403 provides a statutory basis for excluding Judge Rosenblum's testimony, we should impose such a limitation as a matter of public policy. For that proposition, Garvey relies on a number of decisions from other jurisdictions, which it contends unanimously exclude judicial testimony such as that in this case, principally to avoid unfair prejudice and to enforce ethical prohibitions of the appearance of judicial impropriety.

The cases on which Garvey relies, however, do not support its position. The cases that hold that judicial testimony should be excluded involved testimony substantially different in substance from Judge Rosenblum's testimony in this case. For example, several of the cases on which Garvey relies involved judges who testified as *expert* witnesses expressing opinions on an attorney's standard of care or on applicable law in legal malpractice actions related to cases that the judge previously had some connection with in his or her judicial capacity.[10] Other cases involved judges who were asked to testify about their mental processes, including how they would have ruled absent alleged legal malpractice.[11] Judge Rosenblum's testimony was not of that kind, although Judge Guinasso's would have been; the trial court excluded Judge Guinasso's testimony consistently with the Oregon Supreme Court's holding in *Chocktoot v. Smith*, 280 Or 567, 571 P2d 1255 (1977). Finally, the remaining cases on which Garvey relies involved testimony of the kind that OEC 605 directly prohibits—*i.e.*, the testimony of judges who were called as witnesses while currently presiding over some aspect of the trial.[12] Significantly, none of the cases from other jurisdictions involved, as does this one, a judge testifying as a nonexpert witness to the judge's personal observations of events in a prior trial. Indeed, at least one of the authorities that Garvey cites was careful to distinguish such testimony, stating, "Certainly, a judge must, like anyone else, testify to relevant facts within his personal knowledge

---

[10] *Merritt v. Reserve Insurance Company*, 34 Cal App 3d 858, 883, 110 Cal Rptr 511, 528 (1973); *State v. Grimes*, 235 NJ Super 75, 80-81, 561 A2d 647, 649 (NJ Super Ct App Div), *cert den*, 118 NJ 222, 570 A2d 976 (NJ 1989); *Joachim v. Chambers*, 815 SW2d 234, 237-40 (Tex 1991);

[11] Those cases included: *Georgou v. Fritzshall*, 1995 WL 248002 (ND Ill Apr 26, 1995); *Phillips v. Clancy*, 152 Ariz 415, 419, 733 P2d 300, 304 (Ariz Ct App 1986); *Battle v. Thornton*, 646 A2d 315, 325 (DC 1994); *Cornett v. Johnson*, 571 NE2d 572, 575 (Ind Ct App 1991); *Hirschberger v. Silverman*, 80 Ohio App 3d 532, 540-41, 609 NE2d 1301, 1306 (1992); *Harline v. Barker*, 912 P2d 433 (Utah 1996); *Helmbrecht v. St. Paul Ins. Co.*, 122 Wis 2d 94, 105-06, 362 NW2d 118, 125 (1985).

[12] *McCool v. Gehret*, 657 A2d 269, 281 (Del 1995); *State ex rel Carroll v. Junker*, 79 Wash 2d 12, 20-21, 482 P2d 775, 781 (1971). Some actually permitted judicial testimony under certain circumstances, *People v. Drake*, 841 P2d 364, 368 (Colo App 1992); *Ginsberg v. McIntire*, 348 Md 526, 554, 704 A2d 1246, 1259 (1998), while others excluded judicial testimony where other witnesses could provide the same evidence. *Fuller v. Wolters*, 119 Idaho 415, 421, 807 P2d 633, 639 (1991); *Commonwealth v. Ellis*, 1999 WL 855196 (Mass Super Ct Aug 23, 1999).

when summoned to do so." *Joachim v. Chambers*, 815 SW2d 234, 239 (Tex 1991); *see also Gold v. Warden, State Prison*, 222 Conn 312, 319-20, 610 A2d 1153, 1157 (1992) ("A judge is not disqualified and is a competent witness to testify at a new trial or collateral proceeding to observed facts that occurred before him or her at a former trial or proceeding.").[13] We thus find no support in the case law of other jurisdictions for Garvey's position.

Beyond that, we decline to establish an evidentiary rule that a judge may not be called to provide such testimony, as Garvey urges. The only categorical limitation that the legislature has placed on the testimony of judges is contained in OEC 605, which does not apply here because Judge Rosenblum was not called to testify in a case over which she was currently presiding. The legislature, however, is not the only body that has authority to adopt such a limitation. The Oregon Supreme Court, which supervises the professional conduct of judges, may also do so. *See* Or Const, Art VII (Amended), § 8 (giving the Supreme Court supervisory authority over the professional conduct of judges); ORS 1.002(1)(i) (vesting general supervisory power "over the courts of this state" in the Chief Justice). But it, too, has not adopted a limitation on judicial testimony of the kind that Garvey proposes. The only prohibition contained in the Code of Judicial Conduct precludes a judge from testifying "as a character witness except pursuant to subpoena." JR 1-101(G). No provision of law expressly precludes a judge from testifying to factual observations and to his or her communications with the attorneys in a prior trial over which the judge presided.

---

[13] Similarly, the cases on which Garvey relies do not endorse the absolute and categorical rule that Garvey asks us to adopt. The United States Court of Appeals for the Seventh Circuit explicitly rejected such an approach, stating:

"To say that the district court abused its discretion by admitting the testimony in these circumstances would be tantamount to announcing a rule that a judge may never testify in criminal proceedings, no matter how important his testimony or how well the delicacy of his being called is handled. The interests of justice would be served poorly indeed by such a rule, and we decline its adoption as the law of this circuit. *So far as we are aware, no court has even come close to adopting such a position.*"

*United States v. Frankenthal*, 582 F2d 1102, 1108 (7th Cir 1978) (emphasis added).

Public policy arguments likely can be made both for and against a rule precluding such testimony. But it is not our job to arbitrate the issue and to determine the public policy to be pursued. Our role is to ensure that lower tribunals correctly interpret and apply existing principles of law. The trial court did that in this case. The rule that Garvey advances is legislative in character and, because it is, Garvey's arguments are more properly directed to the legislature or the Oregon Supreme Court.

## III. GARVEY'S REMAINING ASSIGNMENTS OF ERROR

The remainder of Garvey's assignments of error do not warrant extended discussion. In its third assignment of error, Garvey asserts that the trial court erred in permitting Judge Rosenblum to "testify over objections that the settlement reached in the underlying case was reasonable." Specifically, Garvey argues that the trial court permitted Judge Rosenblum to testify as an expert and, in that capacity, to offer her opinion of the reasonableness of the amount of the settlement of the Rose/Gunnerson case. That is not what happened, however. Rather, as described above, the trial court ruled that Judge Rosenblum could testify to any opinions that she communicated to the parties during their settlement negotiations, reasoning that such opinions constituted "facts" as to what the parties knew, which in turn was relevant to whether Sansone and its attorneys were negligent in settling the case, as Garvey alleged in its affirmative defense. During Judge Rosenblum's testimony, Sansone's counsel asked her if she expressed any opinions to the attorneys in the Rose/Gunnerson case; she answered that she did. Almost immediately after that, counsel asked:

"Q. And, in your opinion, Judge Rosenblum—$1.25 million was the figure. Was that a reasonable settlement?

"A. Oh, yes.

"[Counsel for Garvey]: Object to the form, *unless it was communicated, Your Honor.*

"THE COURT: *Sustained.*

"Q. [Counsel for Sansone]: Yeah. Did you communicate to the lawyers that that settlement was a reasonable settlement?

"A. I did.

"Q. And can you share with us what your opinions were at that time *that you expressed [them] to those lawyers?*

"A. Yes. To the best of my recollection, I can. They came in and asked me if $1.25 million was a reasonable settlement, and I told them that I thought it was. I thought, for Mr. Wagner, that he was cutting his losses and that was smart of him to make that offer, because I thought it could go a fair amount higher than that, especially given the punitive damages possibilities.

"And as to Mr. Rizzo, I told him I thought he might be able to do better and the jury was favorably inclined—my impression of them—toward their case. I don't think I used the term 'bird in the hand,' but I think that's what I was suggesting to him, but that it was a pretty good offer and he ought to take it."

(Emphasis added.)

As that excerpt of the record reveals, Judge Rosenblum did not testify as an expert witness offering an opinion on the reasonableness of the settlement. Garvey's only objection to that particular testimony was that it should not be admitted if Judge Rosenblum's opinion was not communicated to the attorneys. That objection was sustained, the question was rephrased accordingly, and the testimony was admitted only insofar as it related to opinions that Judge Rosenblum communicated during the settlement negotiations. Garvey's argument in that regard mischaracterizes the trial court's ruling and, as Sansone accurately observes in response, wages battle over something that did not occur. There is no adverse trial court ruling for Garvey to challenge on appeal. *See* ORAP 5.45(3). Garvey's third assignment of error therefore fails.

■ Garvey's fourth assignment of error suffers from a similar, but slightly different, defect. Garvey asserts that the trial court erred in permitting Judge Rosenblum to testify that Wagner was not negligent in how he conducted the Rose/Gunnerson trial. In response, Sansone argues that the testimony came in only in response to a question about Judge Rosenblum's "observations" and that she was not asked to provide an expert opinion on the point. We need not decide if

the trial court's ruling was error. In all events, as Sansone argues, Garvey cannot claim any prejudice as a result of the testimony. The specification of comparative negligence based on Wagner's handling of the underlying trial was withdrawn from the jury for lack of evidence, as Sansone points out in response, and as Garvey concedes. Because that specification of negligence was never submitted to the jury, Garvey cannot demonstrate prejudice. *See* OEC 103(1) ("Evidential error is not presumed to be prejudicial.").

In Garvey's fifth and final assignment of error, Garvey asserts that the "trial court erred in denying Garvey Schubert's motion for new trial and in failing to *sua sponte* order a new trial based on attorney misconduct in closing argument." Although Garvey moved for a new trial based on attorney misconduct, Garvey "acknowledges" in its brief that its argument on appeal concerning the alleged attorney misconduct is "in some respects fuller than that presented below." That characterization is an understatement. In fact, Garvey's argument on appeal sweeps in a broad range of alleged misconduct on the part of opposing counsel that Garvey did not object to at trial, not even in its motion for a new trial. The conduct about which Garvey now complains spans the opening statements, objections during the trial, and closing arguments. Garvey does nothing in its argument to separate those matters that were preserved in its motion for new trial from those that were not, nor does it provide us with the full context for the new matters that it asserts demonstrate misconduct on opposing counsel's part.

We decline to consider Garvey's fifth assignment of error, for two reasons. First, as we have described, much of Garvey's argument in support of the assignment of error is not preserved. Garvey's argument does not distinguish or separate the unpreserved complaints from the preserved ones, and we decline to assume the burden of untangling them.

Second, and as importantly, the general rule is that the denial of a motion for a new trial is not reviewable on appeal when the motion is based on alleged errors committed during the trial. *Phipps v. Air King Manufacturing*, 263 Or 141, 144, 501 P2d 790 (1972); *Boers v. Payline Systems, Inc.*,

141 Or App 238, 918 P2d 432 (1996). Rather, it is incumbent on a party to make a proper objection during trial and to assign error to the ruling on that objection. Garvey does not demonstrate that it timely and adequately objected to any of the matters about which it now complains. Nor does Garvey assign error to any trial rulings on those objections, if Garvey made them. Garvey's fifth assignment of error therefore fails, both because it is not adequately preserved and because it is not reviewable on appeal.

In summary, the trial court did not abuse its discretion in permitting Judge Rosenblum to testify as she did. The trial court adequately addressed Judge Rosenblum's status as a judge by limiting her testimony to factual observations and by giving two cautionary instructions to the jury. The "opinion" testimony that the trial court ruled to be admissible consisted of opinions that Judge Rosenblum communicated to the lawyers trying the Rose/Gunnerson case, such as Judge Rosenblum's opinion that the parties' proposed settlement was reasonable. The trial court properly exercised its discretion in admitting the testimony in that limited fashion, and we find no error in that regard. The remainder of the assigned errors either lack merit, provide no basis for reversal, or are not properly raised.

Affirmed.